955 P.2d 544

The **CITY OF AVONDALE**, a municipal corporation, Plaintiff–Appellee,

v.

**DEERE CREDIT, INC.**, a Delaware corporation, Defendant–Appellant.

No. 1 CA–TX 97–0010.

Court of Appeals of Arizona, Division 1, Department T.

March 10, 1998.

Frank L. Ross, Goodyear, for Plaintiff–Appellee.

Snell & Wilmer, L.L.P. by Janet E. Barton, Phoenix, for Defendant–Appellant.

**OPINION**

PATTERSON, Judge.

¶ 1 The City of Avondale (Avondale) assessed transaction privilege taxes and penalties against Deere Credit, Inc. (Deere) on

Deere's gross proceeds from leasing farm machinery and equipment to customers of Arizona Machinery, a dealership in Avondale. On Deere's protest, a City Hearing Officer directed Avondale's audit department to abate the assessment. As permitted by Avondale City Code (City Code) section 13A–575(b), Avondale appealed to the tax court. The tax court granted summary judgment for Avondale. Deere appeals. For the following reasons we reverse the decision of the tax court.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Deere is a Delaware corporation whose principal offices are in Des Moines, Iowa.[1] Deere offered a "leasing program" to independent, authorized dealers of John Deere equipment and machinery. Under this program Deere would buy a farm implement, piece of equipment or machinery from its authorized dealer and, as part of the same transaction, lease it to the dealer's retail customer. Deere's objective in any particular leasing transaction was to buy the equipment from the dealer at the lowest possible price and to obtain its targeted rate of return from the customer-lessee.

¶ 3 John Deere dealers were not required to participate in the Deere leasing program. However, to participate in the program a dealer had to agree to the program's terms. As a condition of participation, dealers had to acknowledge that they were required to obtain Deere's acceptance of each lease and approval of each lessee before the lease would be executed. The dealer would also have to acknowledge that Deere could accept or reject any lease the dealer offered or discontinue further acceptances at any time. The leasing program agreement additionally provided that the dealer had no authority to enter into a lease or make any representation or promise on Deere's behalf, or to modify the terms of any lease.

¶ 4 Under the leasing program, if a customer visited a participating John Deere dealer and wished to lease rather than buy a farm implement or a piece of farm equipment

or machinery, the dealer would give the customer a leasing application. Once the customer had completed it, the dealer would forward it to a leasing company chosen by the dealer and its customer.

¶ 5 If Deere were the leasing company that the dealer and customer selected, Deere would review and research the information contained in the customer's application at its corporate offices in Moline or Des Moines. If it found the results acceptable, it would prepare a lease agreement. Deere would not commit to the lease or purchase the machinery or equipment from the dealer until the prospective leasing customer had accepted the item and signed the lease agreement. Deere would accordingly send the lease agreement, unexecuted, from its corporate offices to the dealer for the customer's review and signature. Once the customer had accepted and signed the lease, the dealer would deliver the leased equipment to him and return the lease to Deere at its corporate offices in Moline or Des Moines. On receiving the lease agreement and verifying that it had not been altered, Deere would execute it. At the same time, Deere would purchase the leased item from the dealer.

¶ 6 During the period from October 1983 through December 1994, Arizona Machinery, an independent, authorized John Deere dealer in Avondale, participated in Deere's leasing program. It also participated in leasing programs unrelated to Deere or John Deere.

¶ 7 During the relevant period, it appears all of Deere's Arizona lessees of farm implements, equipment and machinery were located outside Avondale city limits. On six occasions it temporarily stored off-lease equipment on Arizona Machinery's premises; however, none of those items was kept or used in Avondale.

¶ 8 In early 1994, Avondale audited Arizona Machinery. Through the audit it learned of Deere's leasing program. Avondale requested and obtained from Deere an accounting of all lease proceeds it had received on equipment it had purchased from Arizona Machinery and then leased to its customers. Avondale later issued a leasing

---

1. Through 1985 and part of 1986, Deere's corporate offices were located in Moline, Illinois.

transaction privilege tax assessment against Deere for the period October 11, 1983, through December 31, 1994. The assessment was for $46,612.73 in taxes, with interest and penalties of $11,653.18.

¶9  On Deere's protest, an Avondale Hearing Officer abated the assessment. Avondale brought this action in the tax court. On Deere's motion for summary judgment, the tax court ruled for Avondale. It explained:

> Avondale assessed its transaction privilege tax on Deere Credit based upon proceeds Deere received leasing farm machinery to various people in Arizona.
>
> Deere protested, arguing that it had no taxation "nexus" to Avondale and that Avondale's tax applied only to motor vehicles, and the tractors it leased were not motor vehicles.
>
> Deere won below and Avondale appealed to the Tax Court. Deere has now moved for summary judgment, arguing the same points it argued below.
>
> I agree with Avondale. I find from the agreed upon facts that Deere does have a taxing "situs" in Avondale and its tractors are motor vehicles under the Avondale tax code.
>
> I also agree with Avondale's argument that a tractor is a motor vehicle within Avondale's tax code.
>
> I therefore deny Deere's Motion for Summary Judgment.

The tax court subsequently signed a formal judgment reciting that the matter had been submitted on cross-motions for summary judgment and ordering judgment for Avondale. Deere timely appeals. We have appellate jurisdiction under Arizona Revised Statutes Annotated (A.R.S.) section 12–2101(B). The Chief Judge has assigned this appeal to Department T of this court as required by A.R.S. sections 12–120.04(G) and 12–170(C).

## ISSUES

¶10  The issues presented are as follows:

1. Whether the tax court abused its discretion in granting Avondale's motion for an extension of time to file a response to Deere's motion for summary judgment;

2. Whether Deere's business activities have a sufficiently substantial nexus with Avondale to validate the imposition of its transaction privilege tax on Deere under the Commerce Clause of the United States Constitution; and

3. Whether the farm equipment that generated the lease proceeds on which Avondale sought to tax Deere constituted "motor vehicles" subject to Avondale's leasing transaction privilege tax despite the location of Deere's place of business outside Avondale.

## DISCUSSION

¶11  We start with the taxing provisions. Avondale imposes business privilege taxes under a version of the Model City Tax Code.[2] City Code section 13A–400(a)(1) provides:

> There are hereby levied and imposed, subject to all other provisions of this Chapter, the following Privilege Taxes for the purpose of raising revenue to be used in defraying the necessary expenses of Avondale, such taxes to be collected by the Tax Collector:
>
> (1) a Privilege Tax upon persons on account of their business activities, to the extent provided elsewhere in this Article, to be measured by the gross income of persons, whether derived from residents of Avondale or not, or whether derived from within Avondale or from without.

---

2.  Avondale adopted its version of the Model City Tax Code on October 8, 1987. MODEL CITY TAX CODE, MASTER VERSION, (League of Arizona Cities & Towns 1997) at p. 2, Green Section. Although Avondale's assessment against Deere covered the period commencing October 11, 1983, and ending December 31, 1994, both sides have consistently treated the post-October 8, 1987 taxing provisions as the basis for the assessment in issue, and neither has taken the position that any issue in this appeal should be resolved differently as pertains to taxes assessed for business activities that occurred before October 8, 1987. We accordingly consider and resolve this appeal entirely against the background of the City Code taxing provisions that have been in effect since October 8, 1987.

City Code section 13A–300(a)(1) requires "every person desiring to engage or continue in business activities within the City upon which a Privilege Tax is imposed by this Chapter" to purchase a privilege license from the Tax Collector. City Code section 13A–330 declares it unlawful for a person to conduct certain business in Avondale prior to obtaining the required privilege license.

¶ 12 City Code section 13A–450 imposes Avondale's privilege license tax on the privilege of conducting the business of "[r]ental, leasing, and licensing for use of tangible personal property." Subsection (a) of that section provides:

> The tax rate shall be at an amount equal to one and one-half percent (1.5%) of the gross income from the business activity upon every person engaging or continuing in the business of leasing, licensing for use, or renting tangible personal property for a consideration, including that which is semi-permanently or permanently installed within the City as provided by Regulation.

¶ 13 In its dispositive ruling, the tax court viewed Deere's argument as follows: "Avondale's tax applied only to motor vehicles, and the tractors it leased were not motor vehicles." We do not interpret Deere's argument before the tax court in quite the same way. Deere's argument below was the same as the one it raises on appeal: that Deere was not subject to Avondale's privilege tax on the business of leasing tangible personal property because, except for the businesses of leasing personal property semi-permanently or permanently installed in Avondale or of long-term leasing of "motor vehicles," which Deere's farm implements, equipment and machinery were not, the City Code deemed the business of leasing tangible personal property to occur at the lessor's place of business—in this case in Moline, Illinois and later in Des Moines, Iowa.

¶ 14 Our reading of the relevant provisions of the City Code leads us to agree with Deere's contention. We infer from City Code sections 13A–300 and 13A–450(a), quoted above, that the Code drafters intended to tax the privilege of conducting the personal property rental business only to the extent the taxpayer exercised that privilege within Avondale.

¶ 15 Language contained in section 13A–450(b) buttresses this reading. That provision creates an exception to the City Code's general situs principle by establishing a special rule for determining the situs of one particular business activity: leasing motor vehicles for 24 months or longer. Consequently, the Code drafters' intent is revealed concerning the situs of other leasing transactions potentially subject to Avondale's privilege license tax. City Code section 13A–450(b) provides:

> Special provisions relating to long-term motor vehicle leases. A lease transaction involving a motor vehicle for a minimum period of twenty-four (24) months **shall be considered to have occurred at the location of the motor vehicle dealership, rather than the location of the place of business of the lessor,** even if the lessor's interest in the lease and its proceeds are sold, transferred, or otherwise assigned to a lease financing institution; provided further that the city or town where such motor vehicle dealership is located levies a Privilege Tax or an equivalent excise tax upon the transaction.

(Underlining in original; bold emphasis added). The plain meaning of the emphasized language is that the business of leasing tangible personal property, other than motor vehicles leased for twenty-four months or longer, is deemed to take place at the lessor's place of business.

¶ 16 City Code Reg. 13A–450.4 further confirms that this was the understanding and intention of the Code drafters. That provision's primary function is to flesh out and illustrate the meaning of the modifier "semi-permanently or permanently installed" in City Code section 13A–450(a). City Code Reg. 13A–450.4 provides:

> (c) Examples of "semi-permanently or permanently installed tangible personal property" include, but are not limited to: computers, duplicating machines, furniture not of portable design, major appliances, store fixtures.

(d) The term does *not* include mobile transportation equipment or tangible personal property designed for regular use at different locations or customarily used at different locations, as under numerous short-term rental, lease, or license agreements, whether or not such property is in fact so used.

(1) For example, **use of a mobile crane, trencher, automobile, or other similar equipment** shall be considered a rental, lease, or license transaction **subject to taxation only by the city or town in which such business office of the lessor is based.**

(2) Other similar examples include, but are not limited to: camping equipment, contracting equipment, chain saw, forklift, household items, invalid needs, janitorial equipment, reducing equipment, furniture of portable design, trucks or trailers, tools, towbars, sump pumps, arc welders.

(Emphasis added). Like City Code section 13A–450(b), City Code Reg. 13A–450.4 demonstrates the drafters' underlying view that subject to narrow exceptions, the business activity of leasing tangible personal property is deemed to occur in the municipality where the lessor maintains its place of business. During the audit period in this case, that municipality was first Moline, Illinois, and then Des Moines, Iowa, never Avondale, Arizona.

¶ 17  Avondale nevertheless promotes City Code section 13A–450(b), quoted above, as supporting the tax court's judgment. It observes that A.R.S. section 28–101(25)[3] defines "motor vehicle" as "any self-propelled vehicle," and asserts this is surely broad enough to encompass farm tractors, cotton pickers, and the like. Avondale also points out that by expressly exempting "farm tractors" from the motor vehicle registration requirement of A.R.S. section 28–302(B), section 28–302(A) demonstrates that the Arizona legislature necessarily viewed them as motor vehicles. Avondale concludes that because the subjects of Deere's leasing business were all motor vehicles under City Code section

13A–450(b), the business is deemed to have taken place at the location of the dealership—Arizona Machinery, in Avondale.

¶ 18  The difficulty with Avondale's argument is that A.R.S. title 28 definitions are for title 28 only. Avondale has not provided us with any reference to the adoption of title 28 definitions in its tax code. Moreover, Avondale cites nothing tending to support the view that Arizona's motor vehicle registration statutes are *in pari materia* with the taxing provisions of the City Code. We likewise find no support for this proposition. Thus, the correct interpretation of section 13A–450(b) must be sought elsewhere.

¶ 19  The City Code does not define "motor vehicle." The Arizona legislature has provided that "[w]ords and phrases shall be construed according to the common and approved use of the language." A.R.S. § 1–213. Farm implements, equipment and machinery are not referred to as "motor vehicles" in any common speech this court has ever heard. Additionally, the dictionary definition of "vehicle" is, in pertinent part, " . . . 5: a means of carrying or transporting something: CONVEYANCE: as a: a carrier of goods or passengers. . . ." WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (UNABRIDGED) 2538 (G. & C. Merriam Co.3d ed.1971). More succinctly, "motor vehicle" is defined as "an automotive vehicle not operated on rails; *esp*: one with rubber tires for use on highways." WEBSTER'S at 1476.

¶ 20  Though some farm implements, equipment and machinery may well be capable of carrying goods or passengers, that is not their intended use. Some such machines have rubber tires and are automotive, but by and large they are not acquired for the purpose of highway transportation. The "approved use of the language," A.R.S. section 1–213, does not classify farm implements, equipment, or machinery as "motor vehicles."

¶ 21  For the purposes of the City Code, Deere did not do its leasing business from a location in Avondale. It leased neither "motor vehicles" nor any tangible personal property that was semi-permanently or per-

---

**3.** This section has been renumbered as 28–101(32) (Supp.1997), however, the parties refer to its former designation at 28–101(25), therefore we do also.

manently installed in Avondale. It did not engage in "the business of leasing, licensing for use, or renting tangible personal property for a consideration" within the meaning of City Code section 13A–450(a). Avondale's deficiency assessment against Deere was therefore without basis in law. The tax court erred in reinstating it.

¶ 22   Because we hold that Avondale's tax did not extend to Deere's leasing activities, we need not consider whether the tax court abused its discretion in granting Avondale's motion for an extension of time to respond to Deere's motion for summary judgment, or whether Avondale could impose its tax on Deere consistent with the Commerce Clause.

### ATTORNEYS' FEES

¶ 23   Deere requests an award of attorneys' fees on appeal. We grant the request pursuant to A.R.S. section 12–348(B) and (E). Deere may establish the amount of its award by complying with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

### CONCLUSION

¶ 24   The decision of the tax court is reversed.

RYAN and THOMPSON, JJ., concur.